WILLIAM L. BLACK, PROSECUTOR, DEFENDANT IN ERROR, v. THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF ATLANTIC, BRYANT REILLY, AND FREDERICK GILKYSON, ROAD COMMISSIONER, RESPONDENTS, PLAINTIFFS IN ERROR.

Argued November 15, 1910—Decided March 6, 1911.

1. The fact that a trolley company occupying a road contracted with a board of chosen freeholders to pay one-third of the cost of constructing and maintaining the road as a county road, did not invalidate a contract entered into by the board with a contractor to do the work of improving the road under the act to provide for the permanent improvement of public roads in this state. *Pamph. L.* 1905, *p.* 94.

2. Section 4 of the Road act of 1905, as amended by *Pamph. L.* 1908, *p.* 561. reads thus : "The estimated amount of all contracts for road improvements awarded in any one year by the board of chosen freeholders, together with the estimated cost for the repair of roads already constructed, shall not exceed (in excess of the amount which any county may raise in any one year) one-fifth of one per centum of the ratables of the county as reported to the state comptroller for the preceding year. *Held,* that the aggregate of contracts awarded in one year, and cost of repairs of roads already built, may amount to one-fifth of one per centum of the previous year's reported ratables in addition to such portion of the amount of one-half of one per centum which could be raised for county purposes, as had not been appropriated to purposes other than for permanent road improvement and for repairs.

3. The cost to the public of a road to be constructed under the act of 1905 (*Pamph L., p.* 94), after deducting from the entire cost one-third to be paid by a trolley company, was $131,068.60, and the state road commissioner approved the contract for that amount. *Held,* a valid approval.

4. The statute of 1905 (*Pamph. L., p.* 94) provides that a contract for improvement and bond by the contractor must be executed within thirty days from the awarding of the contract. *Held,* that a contract executed by the board of chosen freeholders with a contractor after a period of thirty days from the time the contract was awarded, was valid.

On error to the Supreme Court, whose opinion is reported in 51 *Vroom* 29.

For the prosecutor, defendant in error, *Thompson & Cole.*

For the board of chosen freeholders, plaintiff in error, *Higbee & Coulomb.*

For Bryant Reilly, plaintiff in error, *John J. Crandall.*

The opinion of the court was delivered by

REED, J. This writ of error brings up a judgment of the Supreme Court setting aside a contract entered into between the board of chosen freeholders of the county of Atlantic and Bryant Reilly, for the improving of a road known as the Shore road.

The contract thus vacated was entered into by color of "An act to provide for the permanent improvement of public roads

in this state." *Pamph. L.* 1905, *p.* 94. The road, the improvement of which was the purpose of the contract in question, runs from Absecon to Somers Point, a distance of about nine miles. It passes through Pleasantville, Northfield and Linwood. A trolley road to run over this highway was incorporated in 1903, and by virtue of its charter, and of various ordinances of the municipalities through which it passed, the company built the road. The ordinances provided that the trolley company should pave between the rails of its road and for eighteen inches on the outside thereof, with a good and sufficient bed of macadam, and should pave the remainder of the road with seven inches of compact gravel, tapering off to four inches. This work was done, but the company was also to keep the pavement in repair, and this it failed to do. The trolley company became insolvent in 1907, and was sold to the company which now operates it, namely, the Atlantic and Suburban Railway Company.

The stipulation entered into to be used in the Supreme Court stated that the constant heavy traffic over the highway cut it into ruts, and the paving provided for in the ordinance could not be held in place. The road became in very bad condition, indeed dangerous. It was stipulated that in view of this dangerous condition, and in view of the extensive use of the road, the board of chosen freeholders of the county made a proposition to the trolley company, and to the municipalities through which it ran, that if the municipalities would surrender their rights in said road, and if the trolley company would pay one-third of the cost of repaving said road and of keeping it in repair, the said board would make such road a county road and assume the burden of its repaving and maintenance, providing the state commissioner of public roads would approve the same, and would grant an appropriation ·from the state under the Road act already mentioned.

On April 7th, 1909, the board of chosen freeholders passed a resolution making the road a county road, with the consent and direction of the state commissioner of public roads, for the purpose of improving the same and keeping the same in repair under the said act of 1905, providing the trolley com-

pany should pay one-third of the cost of paving and keeping the road in repair.

On June 9th, 1909, specifications for the improvement of the Shore road were approved by the board of chosen freeholders, and on June 21st they were approved by the state road commissioner.

On June 21st, 1909, a contract was entered into between the board of chosen freeholders, the trolley company, and the municipalities mentioned, by which the board agreed to take over the road and enter into a contract for paving the same for a width of thirty feet with a macadam pavement, with an asphaltum or amiesite border, or of some similar substantial material, in accordance with the Road act of 1905, specifications to be approved by the state commissioner of public roads. The trolley company agreed to pay one-third of the cost of building and keeping the pavement in repair, and the municipalities agreed to curb the road without expense to the county or the trolley company.

Bids were advertised for building the road, and rejected for irregularities. Bids were again advertised for, and the contract was awarded to Bryant Reilly at the price of $196,602.89.

The trolley company furnished a bond in the sum of $30,000, conditioned for its performance of its part of the contract of June 21st.

After application by certain bidders for a writ of *certiorari* attacking the award to Reilly had been refused, the contract with Reilly was signed, and it, with the bond, was approved by the state commissioner of public roads on January 14th, 1910.

The approval by the state commissioner was for $131,068.60, this being two-thirds of the whole price of the work, one-third of which was as appears to be paid by the trolley company.

The Supreme Court held that the contract to execute this improvement was invalid, and one of the reasons assigned was because of the accepted offer of the trolley company to pay one-third of the cost of the work. It was not held that the payment of the money was a bribe to the board of chosen freeholders which invalidated its action in the matter. The

doctrine laid down in the case of *North Orange Baptist Church* v. *Orange,* 25 *Vroom* 111, was recognized. In that case the Supreme Court had occasion to pass upon the validity of an ordinance passed by a common council to open a street where a citizen had promised to pay a part of the expense of such opening. It was held that the offer did not invalidate the ordinance.

It is not now necessary to say that no condition can arise in which a gift of money or of property may not operate to bring about an act inimical to public policy. Instances may possibly occur where a colorable public improvement may be so clearly a private affair, instituted in the interests of private persons, and so carried out through the influence of private gifts, that the proceedings would be branded as illegal.

There is nothing in the specifications used in this case to exhibit such a situation.

We think that there was nothing, unless it be found in the statutory language to be mentioned directly, in the offer to pay one-third of the expense of the improvement which invalidates the contract to make the improvement.

The language of section 1 of the act which the board of chosen freeholders is charged with disregarding is this: "When more roads are applied for than can be constructed in any one year, the board of chosen freeholders and state commissioner of public roads shall have power and authority to select from the roads petitioned for the ones first to be constructed, having first regard to the most important roads, and the distribution of the benefits of this act to all parts of their counties."

Assuming that the conditions existed, namely, applications for more roads than could be constructed in 1910, the query is whether the contract by the trolley company to pay one-third of the cost of the improvement invalidated the proceedings of the board of chosen freeholders.

There is nothing in the statute which prevents the improvement of a highway which happens to be partly occupied by a trolley road. There is nothing which prevents the board of chosen freeholders from getting the most advantageous bids for doing the work of improving the road.

In the present case, it is not contended that the Shore road was not a very important highway, nor that its improvement was an inequitable distribution of the benefits of the scheme provided by the act of 1905. The stipulations used in the Supreme Court show that it was a highway of extreme importance, and one in pressing need of improvement. In the face of these stipulations, the importance of the road could not be and was not denied. The decision below was put upon the ground that the facts concerning the character of the Shore road did not matter, but what did matter was the fact that its selection was, or might have been, induced by the contract with the trolley company to pay for a part of the cost of the improvement.

This view leads to the conclusion that no improvement can be made under the act of 1905, unless the entire cost is paid by the state and the county, or the township or municipality through which the road runs, or all cost is paid entirely by abutting owners under section 13 of the act.

It is to be observed that the statute provides that in the selection of roads, when more roads are applied for than can be built in any one year, the board must have first regard to the most important roads and to the distribution of the benefits of the act. These are not the sole considerations, but the first considerations. There are other considerations which would override the claims of a road to be selected, although more important than another selected. One such consideration is that of cost.

The character of the soil over which a road runs, or some other condition, may be such as to involve a cost for an adequate pavement so excessive that while in the judgment of the board it may be an important highway, yet considering the relative cost to the county of its improvement, it may be of less benefit to the county than the improvement of other roads of less importance than it.

If two or more roads were applied for, the cost of one of which would be within the limits of the appropriation for the year, and the cost of each of the others would be in excess of the appropriation, there would seem little doubt of the ability

of the board to select the former, although it might be a less important highway than some of the others.

While the disregard of the statutory first considerations in the selection of a road for improvement may be so inconsiderate and glaring as to amount to an abuse of discretion, yet it cannot be said that the diminution of the cost of one road by reason of the offer of a person or corporation to bear a part of the expense of its improvement, of itself exhibits an inducement amounting to an abuse of discretion.

Attention is called by defendant in error to other parts of the act.

The concluding clause of section 1 of the act of 1908 provides that the board of chosen freeholders before approval of any road, requires as a condition of such approval, that the township or townships or other municipalities through which such road runs shall pay ten per centum of the cost of said improvement, said payment to be applied to the improvement of roads constructed under this act.

It is insisted by the defendant in error that this clause indicates that this is the only method by which the cost of a road to the county and state can be diminished.

This provision places in the hands of the board of chosen freeholders the power to distribute the cost of the road among municipalities representing the public; it does not preclude the board from taking advantage of any feature which private enterprise may present, such as a change in the formation of the surface of the road to be improved, or a gift of land, or a subscription of money, any one of which would lessen the cost of the improvement to the public.

It is also insisted by the counsel for the defendant in error that section 13 of the act indicates that the acceptance of an offer to pay a part of the cost is aside from the provisions of the act.

This section provides that if all the owners of property abutting on a road desire the road, or any section of it to be improved, and shall certify to the board of chosen freeholders that they are willing to bear the entire expense of such improvement, the county engineer shall prepare plans of the work to

be done and submit the same to the owners, and if satisfactory to the owners, they can contract for the work, said contract to be submitted to the board of chosen freeholders for its approval.

This section does not provide for a selection of a road for improvement. Any owners can improve a road. But before it becomes a county road, the road must be built according to the plans approved by the board of chosen freeholders, as the cost of its maintenance will thereafter rest upon the county.

The meaning of this section is that the abutting owners can improve it if they pay all the cost of the improvement, according to approved plans. It has no significance as a limitation upon the power of the boards of chosen freeholders to select a road for improvement when a part of the cost is paid by private persons or corporations.

We think that the contract brought up is not invalid upon the grounds so far discussed.

Another ground upon which the Supreme Court held the contract to be invalid was because it was in violation of section 4 of the Road act of 1905, as amended by the act of 1908. *Pamph. L., p. 561.*

The amended section reads thus: "The estimated amount of all contracts for road improvement awarded in any one year by the board of chosen freeholders, together with the estimated cost for the repair of roads already constructed shall not exceed (in excess of the amount which any county may raise in any one year) one-fifth of one per centum of the ratables of the county as reported to the state comptroller for the preceding year, exclusive of the state appropriation for road purposes apportioned to any county."

The question whether the award of the present contract involved an expenditure in excess of the amount of limitation contained in this section, depends upon the construction of the words, "shall not exceed (in excess of the amount which any county may raise in any one year) one-fifth of one per centum of the ratables of the county as reported for the preceding year."

The defendant in error insists that the amount to which

the board of chosen freeholders is limited is one-fifth of one per centum of the last year's ratables for the county. One-fifth of one per centum of these ratables for the year 1908 would amount to $128,322, while the amount for which the county will be bound for all contracts, including the present contract and costs for repairs, is $197,722.92, not regarding the $65,534.29 to be paid by the trolley company.

Assuming, therefore, that the present contract was awarded in 1909, although finally signed in January, 1910, it appears the amount for contracts already awarded, together with the estimated cost for repairs of roads already constructed, will amount to such a sum that the cost of the present contract would more than exhaust the balance of the tax of one-fifth of one per centum upon the previous year's ratables.

So, unless the county could raise in that year for road improvement a sum other than the one-fifth of one per centum, of which other sum the one-fifth of one per centum would be in excess, the contract would be in excess of the power of the board of chosen freeholders to execute.

It is clear that the legislature in passing the act of 1908 supposed that the county could already raise a sum by taxation which could be applied to road building, else the parenthetical part of the section was meaningless. That the parenthesis was considerately introduced into the statute appears from the fact that the section was a slight modification of a section in the act of 1903, page 145, as re-enacted in the revised act of 1905. For the words in the original section, "shall not exceed one-half of one per centum," were substituted the words now under discussion, "shall not exceed (in excess of the amount which any county may raise in any one year) one-fifth of one per centum;" otherwise, the language of the two sections was similar.

The language "in excess of the amount which any county may raise in any one year," raises the inquiry, what amount could Atlantic county raise in the year 1908 for road improvement?

By the act of 1878, page 207, county expenses were limited each year to three-fourths of one per centum of the gross

valuation of taxable property. By the act of 1902, page 188, it was provided that "the board of chosen freeholders in ordering in each year the amount of money to be raised for county purposes should declare the amount to be raised for each of the following classes and sub-classes of expenditure, to wit: * * * 111. Public works, to wit: * * * Third. For the improvement and repair of public highways when the power to expend money therefor has been vested by law in any such board." Such power had been vested in the boards of chosen freeholders by the act of 1895, ·page 428, sections 5, 7.

The revised act for the improvement of public roads (*Pamph. L.* 1905, *p.* 94) enacted that the board of chosen freeholders on or before the day fixed by law for the meeting of the county board of assessors, shall certify to said board either in the annual tax budget, or separately, two-thirds of the estimated cost of all work contracted for since the meeting of the preceding year, and the same shall be collected in the same manner and at the same time that other county taxes are collected. The act also provides for the alternative method of paying the costs of the improvement by issuing bonds to be later paid for by taxation.

Now, as already remarked, the amount which might be raised in a county in any one year by taxation was originally three-quarters of one per centum of the gross valuation of taxable property. This amount was reduced by later statutes, and in 1906 (*Pamph. L., p.* 206) an act was passed providing for the gradual reduction of the rate of taxation to fifty cents on $100 of assessed valuation of taxable property.

When the act of 1908 was passed, limiting the amount for which contracts could be made in any one year, each county could raise taxes to the amount of at least one-half of one per centum of the assessed valuation of its property for county purposes, among which purposes was that of improving and keeping in repair county roads. This was a power already possessed by the county, distinct from the power conferred by the act of 1908.

The power to make contracts for road improvements, and

the power to fix appropriations for county purposes, is in the same body—the board of chosen freeholders. When the appropriations for purposes other than road improvement and road repair are fixed, and such appropriations exhaust the limitations of the power to tåx, namely, to raise one-half of one per centum, then the power to make road contracts for the year is limited to one-fifth of one per centum under the act of 1908. If, however, the appropriations for purposes other than road improvements and maintenance do not exhaust the power to raise one-half of one per cent., then the additional amount of taxes which might have been raised, up to one-half of one per centum of ratables, may be added to the one-fifth of one per centum in fixing the amounts for which contracts may be entered into in any one year.

There was raised in 1909, for all county purposes in Atlantic county, $202,498.24. There could have been raised $364,716.26, so that in addition to what was raised, a part of which was presumably for road improvement, there could have been raised an additional amount of $162,218.02, which could have been applied to road improvement and repairs. In excess of this sum could have been raised one-fifth of one per centum of the ratables of the preceding year; so the estimated amount of all contracts and the cost of repairs was not in excess of the amount which the county could raise and one-fifth of one per centum of the ratables of the preceding year.

We, therefore, think that the contract was not invalid as being in violation of the act of 1908.

It is again insisted that the approval of the contract by the state road commissioner was illegal because he approved for $131,068.60. This amount was the entire cost of the road, namely, $196,602.89, less the amount to be paid by the trolley company; or in other words, it was the amount to be paid by the county and the state. The purport of the approval was the approval of a contract to cost the public $131,068.60. The form of the approval designated a contract, the terms of which did exactly what his approval indicated, and so was a correct description of the instrument approved.

It is again insisted that the contract for, the improvement of the road is invalid because it was not executed within thirty days of the award. The execution of this contract was delayed for a period in excess of thirty days from the date of the award by reason of applications for writs of *certiorari* to review the making of the award, and because of delay in executing the bond by the trolley company to the board of chosen freeholders already mentioned. The statute, after providing for the forwarding of the bids, and providing that each bidder must accompany his bid with a certified check as a guarantee that if such work is awarded to him, he will enter into a contract with said board of chosen freeholders, proceeds to enact that this contract must be executed, together with the bond of the successful bidder conditioned for the performance of such work within thirty days from the awarding of the contract.

The statute is silent respecting the result of a failure to execute the contract and bond, or either, within the prescribed period. Nor does such a question arise between the county and the successful bidder, either of whom may have refused or failed to execute such papers within the thirty days. These parties have later executed both contract and bond.

The query is whether the execution of these papers within the thirty days was intended as a limitation of the power of the board to execute them thereafter. This is a question of statutory construction. *Suth. Stat. Con.,* § 447.

We think it was not the legislative intention that an award should be void, if for any reason, however necessary, it should not be followed by the executed contract and bond within thirty days thereafter. It is not a question whether a county could, or under what circumstances it could, refuse to execute a contract after the limited period had expired. The question is whether the county could waive a time limit and accept the contract and bond after the expiration of thirty days.

We think it could, and that its acceptance in this case was a valid exercise of the power of the board of chosen freeholders.

We find nothing in the other criticisms of the proceedings which leads us to think the contract invalid.

The judgment brought up should be reversed, and the contracts and proceedings brought up affirmed.

The question whether the plaintiffs in error should be allowed costs in this court and the Supreme Court was not discussed and is not decided.

*For affirmance*—VOORHEES, J.   1.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, REED, BOGERT, VREDENBURGH, CONGDON, JJ.   9.